IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

APPLAUSE PRODUCTION GROUP, LLC,

Plaintiff,

v.

SHOWTIME EVENTS INC., *et al.*,

Defendants.

Case No.: GJH-16-1463

* * * * * * * * * * * * *

## MEMORANDUM OPINION

Plaintiff Applause Production Group, LLC ("Applause") brings this action against Defendants Showtime Events Inc. ("Showtime") and Amilcar Mendez (collectively, "Defendants"), alleging trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), and cybersquatting in violation of the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d)(1)(a). Now pending before the Court is Plaintiff's Motion for Default Judgment, ECF No. 13. No hearing is necessary. Loc. R. 105.6 (D. Md. 2016). For the following reasons, Plaintiff's Motion for Default Judgment is denied.

**I.      BACKGROUND**

Applause is an entertainment business that provides services such as event production, audio/visual services, themed décor and event management. ECF No. 1 ¶ 8. Applause owns Federal Trademark Registration No. 3,756,459 for the "Showtime Events" trademark ("the '459

1

trademark") and conducts business under that name. *Id.* at 1 & ¶ 9; *see also* ECF No. 1-1.[1] The Showtime Events trademark has been in exclusive and continuous use by Plaintiff since January 1, 1996. *Id.* ¶ 10. Applause currently has offices in North Carolina, Michigan and Florida and plans to "expand into other markets in the near future." *Id.* ¶ 8. Applause has expended substantial money and resources in advertising and promoting their mark throughout the United States, resulting in a mark that is "inherently distinctive" and which has "acquired distinctiveness among relevant purchasers." *Id.* ¶ 11.

Defendant Showtime Events Inc. is a Maryland corporation with its principal place of business in Hyattsville, Maryland and Defendant Mendez, a resident of the State of Maryland, is an officer and managing member of Showtime Events Inc. *Id.* ¶ 3. Defendants are also in the entertainment industry, promoting and selling event management services in the Washington, D.C., Maryland and Virginia region. *Id.* ¶ 16; *see also* ECF Nos. 1-4 & 1-7. Applause alleges that Showtime Events Inc. forfeited its corporate charter in or around 2012 and, since that time, Defendant Mendez has been operating the company as a sole proprietorship. *Id.* ¶ 4.

On April 26, 2011, Defendants established a website, www.showtimeeventsinc.com, to promote their company. *Id.* ¶¶ 16, 33; *see also* ECF No. 1-2. They also established and promoted their company using the names "Showtime Events" or "Showtime Events Inc." on various social media pages, such as Facebook, and event planning websites, such as Wedding Wire and the Knot. *Id.* ¶¶ 14-17; *see also* ECF Nos. 1-3, 1-9 & 1-10. Plaintiff alleges that Defendants had actual knowledge of their Showtime Events trademark prior to establishing these websites and listings. *Id.* ¶ 18.

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

On March 19, 2014, Applause notified Defendants of their infringing use of the Showtime Events mark and requested that they cease their use of the mark. *Id.* ¶¶ 28, 34. Defendants allegedly refused, and continued their use of the mark both in their business and on their website. *Id.*

On August 25, 2014, Plaintiff reached out to the host of Defendants' website, Homestead Technologies, and notified them of Defendants' allegedly infringing use of their mark. *Id.* ¶ 36. Homestead, in turn, contacted Defendants and requested the removal of the infringing content, which Defendants declined to do. *Id.* ¶ 37. This process was repeated in January 2016, with Homestead taking the additional step of disabling Defendants' website until the request was complied with. *Id.* ¶ 38, 39. Defendants removed certain content but continued to retain the domain name and operate social media pages using the Showtime Events mark. *Id.* ¶ 40.

Plaintiff alleges that the Showtime Events mark, as used by Applause over the past twenty years, is "incontestable, distinctive and has acquired secondary meaning." *Id.* ¶ 21. They further allege that Defendants' unauthorized use of their mark is likely to cause confusion among potential customers by creating the impression that "Applause itself has offered or endorsed Plaintiff's services." *Id.* ¶¶ 22, 25. Plaintiff alleged that this infringement is willful and "designed to specifically trade and capitalize upon the substantial goodwill of Applause's trademark," *id.* ¶ 28, and that this infringement has caused Plaintiff's goodwill to be "damaged." *Id.* ¶ 27. Plaintiff alleges that Defendants' conduct has caused them harm through lost sales and profits, and forced them to incur the expenses associated with attempting to halt Defendants' actions. ECF No. 13-1 ¶ 41. With respect to their cybersquatting claim, Plaintiff alleges that Defendants' registration of the domain name and continued operation of the website and social media pages demonstrate a bad faith intent to profit from the mark. ECF No. 1 ¶ 41.

3

On May 16, 2016, Plaintiff filed the instant case, alleging trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), and cybersquatting in violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1)(a). ECF No. 1. Defendants were served via a private process server on June 10, 2016. ECF Nos. 7 & 8.

According to the Declaration of Plaintiff's counsel, Caitlin Grant, attached to the Motion for Default, on August 5, 2016, attorney Emily Hanson sent a letter to Plaintiff on behalf of Defendant Mendez expressing his interest in settling the dispute. ECF No. 13-2 at 2-3. Counsel for Plaintiff acknowledged receipt of the letter on August 26, 2016 and replied to Hanson with a draft settlement agreement on August 29, 2016. *Id.* at 2, 4. Receiving no response, Plaintiff mailed the draft settlement agreement to Defendant Mendez at the address provided by Hanson. *Id.* at 2, 6. In the letter, Plaintiff warned Mendez that if they did not reach an agreement by September 15, 2016, Plaintiff would move for default judgment. *Id.* at 6. Again receiving no response, Plaintiff emailed Hanson asking for confirmation that Mendez accepted the terms of settlement. *Id.* at 7.

As no response was forthcoming with respect to this final attempt to negotiate, ECF No. 13-2 at 2, Plaintiff filed a Motion for Clerk's Entry of Default and a Motion for Default Judgment on September 16, 2016. ECF Nos. 12 and 13. An Order of Default was entered by the Clerk of the Court against Defendants on October 6, 2016. ECF No. 14.

## II.   STANDARD OF REVIEW

"A defendant's default does not automatically entitle the plaintiff to entry of a default judgment: rather, that decision is left to the discretion of the court." *Choice Hotels Intern., Inc. v. Savannah Shakti Carp.*, No. DKC-11-0438, 2011 WL 5118328 at * 2 (D. Md. Oct. 25, 2011)

(citing *Dow v. Jones*, 232 F. Supp. 2d 491, 494 (D. Md. 2002)). Although "[t]he Fourth Circuit has a 'strong policy' that 'cases be decided on their merits,'" *id.* (citing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir.1993)), "default judgment may be appropriate when the adversary process has been halted because of an essentially unresponsive party[.]" *Id.* (citing *S.E.C. v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005)). "Upon default, the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not." *Lawbaugh*, 359 F. Supp. 2d at 422. When considering a Motion for Default Judgment, the Court "must [then] determine whether [those] allegations . . . support the relief sought in th[e] action." *Int'l Painters & Allied Trades Indus. Pension Fund v. Capital Restoration & Painting Co.*, 919 F. Supp. 2d 680, 685 (D. Md. 2013) (citation and internal quotation marks omitted).

## III. DISCUSSION

### A. Trademark Infringement[2]

Plaintiff seeks default judgment on their claim that Defendants' use of the Showtime Events mark infringes on their trademark. "To prove trademark infringement, a plaintiff must show both that it has a valid, protectable trademark and that the defendant's use of a 'reproduction, counterfeit, copy, or colorable imitation [of the mark],' 15 U.S.C. § 1114(1),

---

[2] Although Plaintiff also brings a claim of unfair competition under the Lanham Act, "there is no specific Federal cause of action for unfair competition. Instead unfair competition under the Lanham Act is a category of claims consisting primarily of causes of action for false designation of origin and false advertising." *Cava Grp., Inc. v. Mezeh-Annapolis, LLC*, No. GJH-14-355, 2016 WL 3632689, at *2 n.10 (D. Md. July 7, 2016) (quoting *Sussman-Automatic Corp. v. Spa World Corp.*, 15 F. Supp. 3d 258, 272 (E.D.N.Y. 2014)). Plaintiff's pleading makes clear that their claim is more properly construed as one of false designation of origin. *See* ECF No. 13 at 15 ("Here, Defendants' operation of the SHOWTIMEEVENTSINC.COM Website and Social Media pages, and unauthorized use of Plaintiff's mark are false designations of origin."). The Lanham Act specifies that the test of liability for a false designation of origin claim is the same "likelihood of confusion analysis" arising in a traditional trademark infringement claim. *See* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:18 (4th ed. 2003, March 2017 update). Therefore, the Court will dismiss the unfair competition claim as duplicative. *See Sussman-Automatic Corp.*, 15 F. Supp. 3d at 273 (dismissing unfair competition claim as duplicative of trademark infringement claim).

5

creates a likelihood of confusion." *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 91 (4th Cir. 1997) (citing *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir. 1995)). The mere use of a trademark is insufficient to establish infringement; instead the key inquiry is the likelihood of confusion. *What-A-Burger Of Virginia, Inc. v. Whataburger, Inc. Of Corpus Christi, Texas*, 357 F.3d 441, 450 (4th Cir. 2004) (internal citation omitted).

In support of their Motion for Default Judgment, Applause has submitted its registration certificate for the '459 trademark. ECF No. 1-2. When the United States Patent and Trademark Office ("PTO") issues a certificate of registration, "that registration provides the registrant with prima facie evidence of (1) the validity of the mark and its registration, (2) the registrant's ownership, and (3) the registrant's 'exclusive right' to use the mark on or in connection with the goods and services specified in the certificate of registration." *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 524 (4th Cir. 2002) (citing *Am. Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 816 (4th Cir. 2001)). Thus, the dispute over Plaintiff's claim of trademark infringement hinges on whether Defendant's use of "Showtime Events Inc." is "likely to confuse an 'ordinary consumer' as to the source or sponsorship of the goods." *Anheuser-Busch, Inc. v. L. & L. Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992) (citations omitted).

To determine if a likelihood of confusion exists, courts in this district generally look to certain factors derived principally from *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984): (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5)

the similarity of advertising used by the markholders; (6) the defendant's intent; and (7) actual confusion.

"Not all of these factors are of equal importance, nor are they always relevant in any given case." *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 268 (4th Cir. 2006) (internal quotation marks and citation omitted). Rather, the *Pizzeria Uno* factors serve as "only a guide—a catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion." *Anheuser-Busch*, 962 F.2d at 320. Additionally, as the Fourth Circuit has advised, "[i]n conducting the likelihood-of-confusion analysis, a court…look[s] to how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion." *CareFirst of Maryland, Inc.*, 434 F.3d at 267 (internal citations and quotations omitted). Thus, based on the facts presented by Plaintiff, the Court will focus here on the use of the mark in the respective marketplaces in which the parties operate.

Here, Plaintiff's principal place of business is in North Carolina, with additional offices in Florida and Michigan. By contrast, Defendants are based in Maryland, and their advertisements reflect that they also do business in Washington D.C. and Virginia. Although Plaintiff states generally that they have marketed throughout the United States and have plans to expand, they make no specific allegations related to current or future activity in Defendants' marketplace, which appears to be the D.C. metropolitan region.

*What-A-Burger Of Virginia, Inc. v. Whataburger, Inc. Of Corpus Christi, Texas*, 357 F.3d 441 (4th Cir. 2004) is instructive on this point. There, the Fourth Circuit held that "[t]he fact that Texas [Whataburger] and Virginia [What-A-Burger] operate in separate territorial markets—and that Texas [Whataburger] professes no plans to enter the Virginia market—raises significant

7

doubt that Virginia [What-A-Burger ]'s use of the mark creates the 'likelihood of confusion' required for infringement." *What-A-Burger*, 357 F.3d at 450. Further, although the Fourth Circuit cautioned that the likelihood of confusion analysis does not "begin[] and end[] with geographical territories," here, there are no facts alleged to suggest that Plaintiff's mark had been "carried into" Defendants' market, which would increase the likelihood of confusion. *Id.* at 450 n.7 (citation omitted); *see also Fifth Ave. of Long Island Realty Assocs. v. Caruso Mgmt. Co.*, 718 F. Supp. 2d 292, 311 (E.D.N.Y. 2010) (no likelihood of confusion between a New York shopping center named Americana Manhassest and a large shopping center and residential area named Americana at Brand in California because no evidence that plaintiff's mark was distinctive in defendant's market). While both companies advertise on the Internet and social media, their business models are inherently local, providing services that require transportation of materials and in-person contact, within specific, distinct geographic areas. *See Johnson v. Sosebee*, 397 F. Supp. 2d 706, 710 (D.S.C. 2005) (defining a "local business" as one that "either due to high transportation costs or access limited to local consumers, serves a limited area").

"Although 'a senior federal registrant has superior priority' which extends nationwide, 'there is *no likely confusion* for a court to enjoin unless and until the senior user shows a likelihood of entry into the junior user's trade territory.'" *What-A-Burger*, 357 F.3d at 451 (4th Cir. 2004) (quoting 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 26:33 (4th ed. 2003)) (emphasis in the original). Thus, the Court will deny Plaintiff's request for default judgment on their trademark infringement claim without prejudice to Plaintiff amending the Complaint and filing a renewed Motion for Default Judgment if they can show "concrete, impending plans for entry in Defendant's market" or additional evidence demonstrating likelihood of confusion. *See* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair*

8

*Competition* § 26:34 (4th ed., March 2017 update); *see also What-A-Burger*, 357 F.3d 441, 451 (4th Cir. 2004) ("The injunctive *remedy* does not ripen until the registrant shows a *likelihood of entry* into the territory in question.") (citation omitted) (emphasis in the original).

### B. Cybersquatting

Plaintiff also seeks default judgment on their claim of cybersquatting under the ACPA. "Cybersquatting is the practice of registering 'well-known brand names as Internet domain names' in order to force the rightful owners of the marks 'to pay for the right to engage in electronic commerce under their own brand name.'" *Zinner v. Olenych*, 108 F. Supp. 3d 369, 378 (E.D. Va. 2015) (citing *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 267 (4th Cir. 2001)). Pursuant to the ACPA, Plaintiff must allege sufficient facts to demonstrate that "(1) Defendants registered, trafficked in, or used a domain name; (2) that was identical or confusingly similar to a mark owned by Plaintiff; (3) that such mark was distinctive [or famous] at the time Defendants registered the domain name; and (4) Defendants did so with a bad faith intent to profit from such mark." *Zinner*, 108 F. Supp. 3d at 379; *see also* 15 U.S.C. §1125(d)(1)(A). On the facts before the Court, Plaintiff has not demonstrated that Defendants acted with a bad faith intent to profit from the mark.

In determining whether or not the Defendants acted with the requisite bad faith intent to profit, the ACPA lists the following nine factors that the Court may consider:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i). The "first four factors suggest circumstances tending to indicate an absence of bad faith intent to profit from the goodwill of the mark, the next four tend to indicate that such bad faith does exist and the last factor points in either direction, depending on the degree of distinctiveness and fame of the mark." *Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 432 (S.D.N.Y. 2013) (quoting 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:78 (4th ed. 2003)). Courts are not limited to these enumerated factors, however, and the Fourth Circuit has instructed judges to "view the totality of the circumstances in making the bad faith determination." *Newport News Holdings Corp. v. Virtual*

*City Vision, Inc.*, 650 F.3d 423, 435 (4th Cir. 2011) (quoting *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001)). Moreover, not every factor must be considered, as these factors are "intended to serve as a guide while the court carefully considers whether the conduct at issue is motivated by a bad faith intent to profit." *Wagner v. lindawagner.com*, 202 F. Supp. 3d 574, 582 (E.D. Va. 2016), *aff'd*, No. 16-2053, 2017 WL 1019059 (4th Cir. Mar. 15, 2017) (quoting *Volvo Trademark Holding AB v. Volvospares.com*, 703 F.Supp.2d 563, 567 (E.D. Va. 2010)).

Here, a number of the facts alleged in Plaintiff's Complaint relate to factors that demonstrate an *absence* of bad faith. For example, the Complaint alleges that the domain name SHOWTIMEEVENTSINC.COM is consistent with Defendant's name, Showtime Events Inc., ECF No. 1 ¶ 15. This would tend to support the existence of the second factor, that the domain name used was consistent with the Defendant's legal name. Additionally, the Complaint alleges that Defendants use the domain name SHOWTIME EVENTS, INC. on a number of social media outlets and promotions, *id.* ¶ 14, and promote and sell their services using the SHOWTIME EVENTS mark on a variety of wedding event and advertising websites, *id.* ¶ 17. These facts support the existence of the third factor, that Defendants' prior use of the domain name was in connection with the bona fide offering of goods and services. Thus, there are allegations demonstrating an absence of bad faith.

Conversely, in their Motion for Default, Plaintiff fails to identify which factors indicative of bad faith are supported by the facts alleged.[3] And, indeed, a review of the facts alleged by Plaintiff demonstrates that Plaintiff has not sufficiently alleged an intent to divert consumers from Plaintiff's online location to Defendants' through creation of a likelihood of confusion

---

[3] Plaintiff uses bold lettering in their Motion when identifying the first, fifth, eighth and ninth factors. ECF No. 13 at 12-13. While the Court assumes Plaintiff's intention was to highlight those particular factors, Plaintiff does not explain how the alleged facts support the application of those factors.

11

(factor five), an offer to sell or transfer the domain name for financial gain without an intent to use the domain name in a bona fide attempt to offer goods or services (factor six), the use of inaccurate contact information (factor seven) or Defendant's registration or acquisition of multiple domain names which are confusingly similar (factor eight).[4]

The ninth factor, the strength of the mark, weighs against a finding of bad faith. While, as explained above, registration of their mark is presumptive evidence that their mark is indeed distinctive, the Plaintiff must also allege that their mark is famous. *Zinner*, 108 F. Supp. 3d at 392 n.8 (stating that the ninth factor "requires that a mark be *both* distinctive and famous") (emphasis in the original).[5] In the context of the ACPA, a mark is famous "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). While their mark may indeed be known to purchasers in the region in which they operate, North Carolina, Florida and Michigan, they have provided no facts to suggest that their name has acquired "famous" status to purchasers in the market in which Defendants operate, the Maryland, DC, Virginia region, that would support an inference of bad faith. Thus, this factor weighs against a finding of bad faith.

As indicated previously, however, the Court's review is not limited to a rote calculation of the number of factors in each parties' favor. Instead, as the court in *Gionconda Law Group* explained, the Court's inquiry in a ACPA case must be guided by an overall evaluation of how closely the defendant's conduct falls into the "ACPA's heartland." *Gionconda*, 941 F. Supp.2d at 433. There, the court noted two textbook examples of bad faith:

---

[4] Although Plaintiff suggests that Defendants use the same name on multiple websites, this is easily distinguishable from cases where bad faith intent to profit was found based on this factor. *See, e.g., Montblanc-Simplo GmbH v. AChatStyloMontblanc.com*, No. 1:13-CV-1013 AJT/IDD, 2014 WL 107395, at *4 (E.D. Va. Jan. 3, 2014) (finding bad faith where defendant registered ten *different* domain names with various combinations of Plaintiff's mark and a synonym for "cheap").
[5] In the same footnote, the court notes that this conjunctive rather than disjunctive requirement may be a flaw in the drafting of the statute. *Id.*

12

where a defendant 'purchases a domain name very similar to the trademark owner and then offers to sell the name to the trademark owner at an extortionate price' and where a defendant 'intends to profit by diverting customers from the website of the trademark owner to the defendant's own website, where the consumers would purchase the defendant's products or services instead of the trademark owner's.'

*Id.* at 434 (citation omitted). The case currently before the Court bears no resemblance to either example. Here, based on the Plaintiff's own allegations, the Defendants opened a business in a different state than Plaintiff, used a domain name consistent with the name of their business, used that domain name for bona fide business purposes and not for the purpose for forcing Plaintiff to buy the domain name from them at an extortionate price and took no steps indicative of an attempt to divert customers from Plaintiff's website to theirs.

As other courts have cautioned, to succeed on an ACPA claim, a plaintiff must show that the defendant's use of the domain name is "an attempt to profit specifically from 'squatting' on the domain name with bad faith," rather than "simply ... another aspect of the alleged trademark infringement." *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 351 (S.D.N.Y. 2014). Plaintiff is unable to make this showing. Thus, Plaintiff's allegations do not establish a bad faith intent to profit and the Motion for Default Judgment is denied as to the ACPA claim.[6]

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Default Judgment, ECF No. 13, shall be denied. A separate Order follows.

Dated: May 4, 2017

GEORGE J. HAZEL
United States District Judge

---

[6] While additional allegations may be sufficient to establish Plaintiff's trademark infringement claim, Plaintiff does not appear to have a viable cybersquatting claim.

13